IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

TERRELL MANUEL,
et al.,

     Plaintiff,

v.                         Civil Action No. 3:14cv238

WELLS FARGO BANK,
NATIONAL ASSOCIATION

     Defendant.

**MEMORANDUM OPINION**

This case is before the Court on the Defendant's MOTION FOR SUMMARY JUDGMENT (Docket No. 57). For the reasons set forth below, this motion will be denied.

**BACKGROUND**

**A. PLAINTIFF'S CLAIMS**

On April 1, 2014 plaintiffs Terrell Manuel ("Manuel") and Charles White ("White") filed a class action complaint on behalf of themselves and all others similarly situated alleging that defendant Wells Fargo Bank, N.A. ("Wells Fargo") had violated the Fair Credit Reporting Act ("FCRA"). Docket No. 1. That complaint was amended three times, and the operative complaint at this time is the Third Amended Class Complaint ("TAC"). Docket No. 41.

The TAC alleges two counts claiming that the Defendants violated the Fair Credit Reporting Act ("FCRA").   Count One alleges a violation of §1681b(b)(2)(A), which requires that "a person may not procure a consumer report, or cause a consumer report to be procured, for employment purposes with respect to any consumer, unless: (i) a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, in a document that consists solely of the disclosure, that a consumer report may be obtained for employment purposes; and (ii) the consumer has authorized in writing (which authorization may be made on the document referred to in clause (i)) the procurement of the report by that person."

Count Two alleges that Wells Fargo violated §1682b(b)(3)(A)(i) of the FCRA.   §1681b(b)(3)(A)(i) requires that "in using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates: (i) a copy of the report; and (ii) a description in writing of the rights of the consumer under this subchapter, as presented by the Bureau under section 1681g(c)(3) of this title."

Plaintiffs filed the instant Motion for Summary Judgment on April 30, 2015.   Docket No. 57.   Defendants have opposed the

motion.   Docket No. 70.   Plaintiffs have replied in support. Docket No. 73.

**B. Factual Background**

   **a. Facts Regarding Plaintiff Manuel[1]**

   During February of 2012, Manuel completed an online application for an open loan document specialist position at Wells Fargo.  On or about February 24, 2012, Manuel completed an interview with Wells Fargo personnel and was offered the position conditioned upon the successful completion of a background check.  He was given an offer letter and signed and returned said offer letter.  On February 25, 2012, pursuant to Wells Fargo's instructions, Manuel accessed the First Advantage[2] website and completed two documents: the "Wells Fargo Standard Application" and the "Wells Fargo Standard Consent".  This initiated a criminal background screening process which was completed on April 3, 2012.  Manuel's background screening reported two convictions for petit larceny as well as a conviction for aggravated assault with serious bodily injury in the second degree.

---

[1] Plaintiffs have agreed that White is not a proper representative for the class, thus the facts particular to his case will not be discussed herein. Docket No. 68.  His individual claims have been severed from the instant class action.

[2] First Advantage conducts background checks for Wells Fargo.

Upon receiving the above information, Wells Fargo coded Manuel as "ineligible" within the First Advantage system. This prompted First Advantage to begin the "adverse action" protocol described below. On April 11 or 12, 2012, Manuel received a letter that referred to itself as a "Pre-Adverse Action Notice" and was dated April 3, 2012. That letter included a copy of Manuel's background report and an FCRA Summary of Rights. After Manuel received the Pre-Adverse Action Notice, he began the appeal/dispute process described in the letter and filed a written dispute of the contents of his Pre-Employment/Security Screening. First Advantage then generated a revised report that still contained the convictions at issue. Wells Fargo contends that only then did it determine "on June 28, 2012 that Manuel was ineligible for employment with Wells Fargo."

**b. Wells Fargo's Procurement and Use of Consumer Reports**

The parties have stipulated to the following facts (see Docket No. 43):

>    1. Stipulation One: After March 1, 2010, Wells Fargo's standard policy and procedure for using criminal background screenings in regards to current and prospective employees in its Home Mortgage Business Line was as follows:
>
>    a. Wells Fargo refers individuals subject to criminal background screenings to a website operated by First Advantage Background Services Corporation. Such individuals use this website to complete a number of application forms, including

disclosure and authorization forms related to the criminal background screening. After all application forms are completed First Advantage Background Services Corporation generates the criminal background screening report and provides its findings to Wells Fargo. Specifically, First Advantage enters the criminal background screening report into a database to which both First Advantage and Wells Fargo have access.

b. Members of Wells Fargo's Background Screening Compliance Team then review the results to make a determination as to whether the current or prospective employee was ineligible for the relevant employment position in whole or in part because of the content of the criminal background check. If the reviewing members of the Background Screening Compliance Team believe that the individual in question would not meet employment eligibility requirements for the position to which he or she applied based in whole or in part on the contents of his or her criminal background screening report, the reviewing members would then access the database to which both First Advantage and Wells Fargo have access and enter a code or other notation that the applicant would not be eligible for the employment position based in whole or in part on the contents of his or her criminal background screening report. Upon the entry of this coding, First Advantage generates and sends a notice, with the title "Pre-Adverse Action Notice", which was substantially similar at all relevant times to the ones sent to Plaintiffs Manuel and White, and mails it, along with an FCRA Summary of Rights Notice and a copy of the current or prospective employee's criminal background screening results, to the current or prospective employee. If the current or prospective employee does not appeal or dispute the

results of his or her criminal background
screening during the next five business
days after the first notice is mailed,
First Advantage generates and sends the
applicant or employee an Adverse Action
Notice, which was substantially similar at
all relevant times to the ones sent to
Plaintiffs Manuel and White.

2. Stipulation Two: During the putative
class period, at least 1000 current or
prospective employees associated with Wells
Fargo's Home Mortgage Business Line were
subjected to the process described in
Stipulation One.

3. Stipulation Three: During the putative
class period, at least 1000 current or
prospective employees associated with Wells
Fargo's Home Mortgage Business Line were
notified by Wells Fargo, either in person or
via telephone, communicating that the
current or prospective applicant's criminal
background screening report contains records
that may preclude employment with Wells
Fargo before Wells Fargo or First Advantage
generated and mailed a Pre-Adverse Action
Notice along with an FCRA Summary of Rights
Notice and a copy of the applicant's
criminal background screening results.

4. Stipulation Four: Wells Fargo retains
detailed employment and application records
related to all individuals who were rejected
for employment based in whole or in part on
the contents of a criminal background
screening obtained from First Advantage
Background Services Corporation. In the
event that any class is certified in this
case, Wells Fargo can identify these current
or prospective employees described in
Stipulations One, Two, and Three for the
relevant time period.

The background check process was conducted as follows:  all
current and prospective employees subject to a background check

were asked to visit First Advantage's website.  Once on the website, the individuals filled out several forms.  One of these forms was a disclosure and authorization form that contained the following release language:  "You hereby release the Company, First Advantage and all Third Parties to the full extent permitted by law, from any liability or claims arising from retrieving and/or reporting information concerning you and/or from using the Report for employment purposes."

Once the applicant completed the forms, First Advantage generated a background check on the individual and forwarded the results to Wells Fargo by uploading the results into a database that Wells Fargo and First Advantage could both access.  Members of Wells Fargo's Background Screening Compliance Team then reviewed these results and determined whether the applicant appeared to be ineligible for employment based on the contents of the background check.  That determination was entered into the shared database in the form of a code.  Although Wells Fargo refers to this as a "preliminary" determination, Manuel correctly points out that it was the only affirmative step taken by Wells Fargo in the process.  According to Manuel, this was a final hiring decision.

Once the code was entered into the database, First Advantage would generate and send a notice titled "Pre-Adverse Action Notice", a summary of the consumer's FCRA rights, and the

7

applicant's background check to that applicant.   The applicant then had five business days after that notice was mailed to dispute the report.   If no dispute or appeal was made, First Advantage's system automatically generated what it called an "Adverse Action Notice" and sent it to the applicant.   At that point, the process was complete.

The record reflects that the same process was followed by Wells Fargo in its Mortgage Business Line and its other businesses as well.   <u>See</u> Rule 30(b)(6) Deposition of Timothy Brain, 39:16-40:17.

## C.   Other Relevant Laws

Wells Fargo's position relies, in part, on two statutes that bear mention here.   Their significance will be discussed later.

Section 19 of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) prohibits "any person who has been convicted of any criminal offense involving dishonesty or a breach of trust or money laundering" from "participat[ing], directly or indirectly, in the conduct of the affairs of any insured depository institution."   12 U.S.C. §1829(a)(1)(A).   Additionally, the insured depository itself "may not permit any person [who has been convicted of any criminal offense involving dishonesty or a breach of trust or money laundering] to continue any conduct or continue any relations prohibited."   12 U.S.C.

1829(a)(1)(B).  A person or institution that violates this law can be fined "not more than $1,000,000 for each day such prohibition is violated" or can be "imprisoned for not more than 5 years, or both."  12 U.S.C. §1829(b).

The "Helping Family Save Their Homes Act of 2009" (HFSTH Act) established additional ineligibility criteria for Federal Housing Authority lenders and mortgagees.  Specifically, the HFSTH Act requires that "a lender or mortgagee shall not have any officer, partner, director, principal, manager, supervisor, loan processor, loan underwriter, or loan originator of the applicant mortgagee who: (a) is under indictment for, or has been convicted of, an offense that reflects adversely upon the applicant's integrity, competence or fitness to meet the responsibilities of an approved mortgagee; (b) has been convicted of or pled guilty or nolo contendre to a felony related to participation in the real estate or mortgage loan industry; (i) during the 7-year period preceding the date of the application for licensing and registration; or (ii) at any time preceding such date of application, if such felony involved an act of fraud, dishonesty, or a breach of trust, or money laundering."  Docket No. 58 at 3-4.

9

## DISCUSSION

### I.   Standing

In its third argument, Wells Fargo argues that Manuel lacks Article III standing to pursue the § 1681b(b)(2)(A) claim because he has not alleged a legally-cognizable injury-in-fact. [3] This argument must be analyzed before all others.  If Manuel does not have standing, the Court lacks subject matter jurisdiction and can go no further in evaluating Manuel's §1681b(b)(2)(A) claim.  Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006).

### a. Legal Standard

The United States Constitution's "case-or-controversy" requirement limits the jurisdiction of the federal court system. U.S. Const. Art III § 2.   In order to fall within the Constitution's limits and thus the federal court system's jurisdiction, a plaintiff suing in federal court must have standing to pursue his or her claim.  If a named plaintiff in a putative class action cannot establish that he has standing to pursue a claim or claims, then the entire action must be

---

[3] The Supreme Court of the United States has granted a writ of certiorari in the case of Spokeo, Inc. v. Robins, 742 F.3d 409 (9th Cir. 2014), which it will hear next term.  That case asks "whether Congress may confer Article III standing upon a plaintiff who suffers no concrete harm, and who therefore could not otherwise invoke the jurisdiction of a federal court, by authorizing a private right of action based on a bare violation of a federal statute."

dismissed as to the claim or claims as to which standing is lacking.  Doe v. Obama, 631 F.3d 157, 161 (4th Cir. 2011).

Over the years, the law of standing has been developed in such a way that it now consists of three elements.  "First, the plaintiff must have suffered an 'injury-in-fact' – an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the asserted injury and the asserted wrongful conduct in that the injury has to be fairly traceable to the challenged action of the defendants and not the result of the independent action of some third party not before the court.  Third, it must be 'likely', as opposed to merely 'speculative', that the injury will be redressed by a favorable decision."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal quotations omitted).  The party invoking federal jurisdiction bears the burden of proving that these three requirements are satisfied. Id. at 560; Warth v. Seldin, 42 U.S. 490, 518 (1975).

### b. Parties' Arguments

Wells Fargo argues that the "deprivation[] of statutory rights, standing alone [does] not confer constitutional standing because such violations are not substitutes for an injury-in-fact."  Id. at 25.   Instead, Wells Fargo asserts that a

25

plaintiff must establish an actual injury in fact in order to properly assert constitutional standing.

Wells Fargo notes that this issue was recently decided against its interests in this district in _Dreher v. Experion Information Solutions, Inc._,[4] but argues that _Dreher_ is both distinguishable and, in some ways, incorrect. It was distinguishable, according to Wells Fargo, because _Dreher_ involved plaintiffs who alleged "violations of personal statutory rights to receive certain information from consumer reporting agencies" and thus alleged "cognizable information injuries." _Id._ at 26. In this case, however, Wells Fargo argues that Manuel's § 1681b(b)(2)(A) claim alleges that he received too much information (i.e. the waiver included in the disclosure) rather than not enough.

Second, Wells Fargo argues that _Dreher_ "gave short shrift to long-standing U.S. Supreme Court doctrine and misapplied mandatory authority; namely _Warth v. Seldin._" _Id._ Specifically, Wells Fargo argues that the Court in _Dreher_ incorrectly cited _Warth_ "for the proposition that Congress is essentially empowered to eradicate the requirement for Article III standing." _Id._ However, Wells Fargo argues that _Warth_ stated that, "notwithstanding the above-cited passing observation, 'the

---

[4] 2014 WL 6834867 (E.D. Va. 2014).

plaintiff still must allege a distinct and palpable injury to himself.'" Id. (quoting Warth, 422 U.S. at 501).

Manuel responds that he and the putative class members have, indeed suffered an injury-in-fact. He alleges that class members are challenging "Wells Fargo's failure to provide information in the form of a mandated disclosure...unencumbered by extraneous information...that would tend to distract from the mandated disclosure" and that this is an "informational injury." Id. Manuel argues that the "doctrine of informational injury" is well-established within the Fourth Circuit and by the Supreme Court. Id. at 30-31 (citing Salt Institute v. Leavitt, 440 F.3d 156, 159 (4th Cir. 2006); Project Vote/Voting for Am., Inc. v. Long, 752 F. Supp. 2d 697, 703 (E.D. Va. 2010); Public Citizen v. U.S. Dept. of Justice, 491 U.S. 440, 449 (1989)).

Next, Manuel distinguishes the only Fourth Circuit opinion that Wells Fargo cites in support of its argument – David v. Alphin[5]. That case was brought under the Employee Retirement Income Security Act of 1974 (ERISA) by members of the pension plan "on behalf of the pension plan." Id. at 32 (citing David, 704 F.3d at 332.) The suing individuals were not permitted to recover individually under ERISA, and thus had nothing at stake by bringing a private enforcement action. Id. Manuel argues that the FCRA is different than ERISA because it "creates both a

---

[5] 704 F.3d 327 (4th Cir. 2013).

cause of action and an individual right.  When someone violates the FCRA with respect to a particular consumer, they are liable to that consumer."  Id. (quotation omitted).

### c. Analysis

Manuel has sufficiently alleged an injury-in-fact and thus has standing to pursue his §1681b(b)(2)(A) claim in federal court.

§ 1681b(b)(2)(A) guarantees consumers a certain kind of disclosure before a person procures a consumer report containing their information.  Specifically, it promises a consumer "a clear a conspicuous disclosure...made in writing...before the report is procured or caused to be procured, in a document that consists solely of the disclosure, that a consumer report may be obtained for employment purposes."

In this case, Manuel is alleging that the disclosure that Wells Fargo provided to him was not "clear and conspicuous" because it did not "consist[] solely of the disclosure", but also contained a statement of waiver at the bottom.  Thus, Manuel is clearly alleging an informational injury – while he did receive a type of information, it was not the type of information that he was entitled to under the FCRA.  "Under the [FCRA], consumers have the right to receive certain information from consumer reporting agencies", including a clear and

14

conspicuous disclosure.  _Dreher_, at *4.  Manuel is alleging that Wells Fargo failed to provide such a disclosure.

Those allegations are sufficient to allege an injury-in-fact and create standing to sue in federal court for two reasons.  First, as explained in _Dreher_, "Congress created a legal right under the [FCRA], the violation of which constituted an injury sufficient for constitutional standing purposes." _Dreher_ at *3.  It is well-established that "Congress may create a statutory right or entitlement the alleged deprivation of which can confer standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of the statute."  _Warth_, 422 U.S. at 514.  Congress has clearly created rights on the individual consumer level through the FCRA and has also created a private right of action through which individual consumers can enforce their rights.  _See_ 15 U.S.C. §1681n(a) ("Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer...").

Second, contrary to Wells Fargo's view, _David_ does not control this case because its holding speaks only to the particularities of the ERISA statute and the facts presented in that decision.  _David_, 704 F.3d at 338.  In _David_, the plaintiffs were permitted to sue under the ERISA statute, but they were "not permitted to recover individually."  _Id._ at 332.

15

Instead, "all relief [had to] go to the Plan itself." Id. Thus, the plaintiffs did not have an individual private right of action to redress the injury alleged. Instead, they could only sue to secure redress to another entity: the plan. In addition, the Fourth Circuit clearly stated that the plaintiffs in David had not suffered any injury because it was the plan, and not its members, that would bear the burden of mismanagement. That situation is unlike the one presented here. Manuel is asserting his own rights through a private right of action conferred on consumers and, under a statute that allows consumers to recover damages if they are successful.

Also, in David, the Fourth Circuit found that, on the alleged facts, the Plaintiffs' claim was speculative. That simply is not the case here and thus David is inapplicable for that additional reason.

Wholly apart from the foregoing, Manuel has demonstrated an injury-in-fact through his allegations that he was deprived of the appropriate type of information under § 1681b(b)(2)(A). It is well- established that a deprivation of information is sufficient to satisfy the injury-in-fact requirement. See Fed. Election Comm'n v. Atkins, 524 U.S. 11, 22 (1998). Under the FCRA, Manuel and other consumers have the right to specific information at specific times. The allegations that Defendant failed to provide that information, or that they provided the

16

information after it was required are sufficient to posit "an invasion of a legally protected interest which is (a) accurate and particularized and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. at 560-61. And, Manuel has made a sufficient showing on those points. Thus, Manuel satisfies the "injury-in-fact" component of the accepted standing calculus.

Moreover, Congress is presumed to be aware of the Supreme Court's jurisprudence when it enacts statutes. United States v. Langley, 62 F.3d 602, 605 (4th Cir. 1995) ("Thus, it is proper to consider that Congress acts with knowledge of existing law, and that absent a clear manifestation of contrary intent, a newly-enacted or revised statute is presumed to be harmonious with existing law and its judicial construction.") (internal quotation omitted); see also Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 267-68, (1992); Miles v. Apex Marine Corp., 498 U.S. 19, 32 (1990); Cannon v. University of Chicago, 441 U.S. 677, 696-97 (1979). The law of standing enjoys no exemption from that presumption.

It would be passing strange for Congress to have created the FCRA, a rather extensive set of private rights the violation of which gives rise to damages that are available to individual consumers and also to rely on the so-called "private attorney-general concept" for enforcement of the statutory rights, but

leave the holders of those rights without standing to enforce them. Indeed, Congress did no such thing because the FCRA provides for actual and punitive damages. The concept that even award of nominal actual damages can support an award of punitive damages is no stranger to the law. <u>Insurance Services of Beaufort, Inc. v. Aetna Cas. And Sur. Co.</u>, 966 F.2d 847, 853 (4th Cir. 1992) ("The district court should also consider that nominal damages can, in some circumstances, support an award of punitive damages.") And, the deprivation of a right is itself an injury even if the injury is slight or nominal. That certainly is true of the rights at issue in Counts One and Two of the FAC.

Congress struck a balance in FCRA cases by also allowing limited statutory damages because often injury from the deprivation of an FCRA right often can be hard to prove. <u>See Harris v. Mexican Specialty Foods, Inc.</u>, 564 F.3d 1301 (11th Cir. 2009) ("This court has recognized that even though statutory damages may be used in cases where no actual damages were incurred, they are also often employed where damages are difficult or impossible to calculate."); <u>Murray v. GMAC Mortg. Corp.</u>, 434 F.3d 948, 953 (7th Cir. 2006) ("[I]ndividual losses [under the FCRA], if any, are likely to be small – [for example,] a modest concern about privacy [or] a slight chance that information would leak out and lead to identity theft.

18

[Because the] actual loss is small and hard to qualify...statutes such as the Fair Credit Reporting Act provide for modest damages without proof of injury."); A. S. Pratt & Sons, Law of Fin. Privacy ¶ 1.09(2) (2014) ("It often is difficult for a plaintiff to establish actual damages under the FCRA, and the failure to recover any monetary award can also preclude a plaintiff from recovering court costs and attorney's fees, even if the plaintiff can establish a negligent violation of the FCRA. As a result, plaintiffs frequently will allege willful violations of the FCRA in an effort to secure minimum statutory damages and the possibility of punitive damages, and thereby to qualify for court costs and attorney's fees.")

Congress afforded relief from violation of the statutory right and an incentive for CRA's to obey the law as because they risk the imposition of damages (even though not always great) and the prospect of paying a plaintiff's attorneys' fees for depriving consumers of rights to which they are entitled under the FCRA. If individual consumers did not have standing to redress violations of the FCRA where damages are difficult to prove, the purposes of the FCRA would be frustrated.

## II.   Summary Judgment Standard

Under Fed. R. Civ. P. 56, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

19

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. f6(c). In Celotex Corp. v. Catrett[6], the Supreme Court stated that Rule 56(c) requires the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. In order to enter summary judgment "there can be no genuine issue as to any material fact, since a complete failure to proof concerning an essential elements of the nonmoving party's case renders all other facts immaterial." Id. at 323.

When reviewing a motion for summary judgment, a court must interpret the facts and any inferences drawn therefrom in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Seabulk Offshore, Ltd. V. Am. Home. Assurance Co., 377 F.3d 408, 418 (4th Cir. 2004). In order to successfully oppose a motion for summary judgment, the nonmoving party must demonstrate to the court that there are specific facts that would create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). "Where...the record

---

[6] 477 U.S. 317 (1986).

taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991).

### III. § 1681b(b)(3)(A) – Adverse Action Argument

Wells Fargo argues that it is entitled to summary judgment on Manuel's § 1681b(b)(3)(A) claim in Count Two because the action of sending notice to First Advantage that a candidate was likely ineligible and thus needed to receive the two adverse action letters does not qualify as an "adverse action" under the FCRA. Docket No. 58 at 10.

#### a. Legal Standard

§ 1681b(b)(3)(A) requires that, "in using a consumer report for employment purposes, before taking any adverse action based in whole or in part on that report, the person intending to take such adverse action shall provide to the consumer to whom the report relates (i) a copy of the report; and (ii) a description in writing of the rights of the consumer under this subchapter."

An "adverse action" must be taken in order for a violation of the statute to occur. The FCRA has several definitions of the term "adverse action." §1681a(k)(1)(B). There are two that are important for the purposes of this motion. First, the FCRA defines an "adverse action" as "denial of employment or any other decision for employment purposes that adversely affects

21

any   current   or   prospective   employee." 15 U.S.C. §1681a(k)(1)(B)(ii).   Second,   it   defines   an   "adverse   action"   as "an   action   taken   or   determination   that   is   -   (I)   made   in connection   with   an   application   that   was   made   by...any consumer...and (II) adverse to the interests of the consumer." §1681a(k)(1)(A)(iv).

### a. Parties' Arguments

Wells   Fargo   has   moved   for   summary   judgment   on   the   argument that §1681b(b)(3)(A) "expressly allows for the formation of an intent   to   take   adverse   action   before   complying   to   §1681b(b)(3) because   it   states   that   'the   person   _intending_   to   take'   adverse action   must   provide   the   report   and   description   of   rights." Docket   No.   58   at   10   (quoting   Obabueki   v.   Int'l   Bus.   Machs. Corp., 145 F. Supp. 2d 371, 392 (S.D.N.Y. 2001)) (emphasis in original).   Thus,   says   Wells   Fargo,   a   preliminary   decision   to take   an   adverse   action   does   not   trigger   the   FCRA,   and   "an adverse action occurs when the decision is carried out, when it is   communicated   [to   the   applicant   or   employee]   or   actually   takes effect,   and   an   actor   has   until   that   time   to   take   the   necessary steps   to   comply   with   the   FCRA's   requirements." Id. at 11 (quoting Moore v. Rite Aid Hdqrts Corp., 33 F. Supp. 3d 569, 574 (E.D. Penn. 2014)).

Wells   Fargo   further   argues   that   its   action   of   "making   a _preliminary_   determination...that   an   applicant   or   team   member

does not appear eligible for employment and communicating that
preliminary determination to First Advantage for the purpose of
notifying First Advantage of the need to send out the FCRA
disclosures" does not qualify as an adverse action under the
FCRA.   Id. (emphasis in original).   If it did, Wells Fargo
argues, "it would be impossible to send a meaningful pre-adverse
action notice, as required by the FCRA, without first forming on
[sic] intent to take adverse action."   Id.

Wells Fargo relies heavily on the Obabueki[7] case out of the
Southern District of New York in making this argument.   In
Obabeuki, the plaintiff argued that the defendant took an
adverse action against him when its human resources department
originally reviewed his application and decided to withdraw his
offer.   Because that occurred before the pre-adverse action
notice was sent, he argued that this violated § 1681b(b)(3)(A).
The court there held that "[a]n internal decision to rescind an
offer is not an adverse action" and thus did not qualify as an
adverse action.   Id. at 391.   In reaching that conclusion, the
court noted that the "plaintiff did not suffer any adverse
effect until his offer of conditional employment was
[officially] withdrawn" and stated to hold otherwise would
"effectively allow every employee who suffers an adverse

---

[7] Obabueki v. Int'l Bus. Machs. Corp., 145 F. Supp. 2d 371, 392
(S.D.N.Y. 2001).

employment action following a credit agency report to file an FCRA claim asserting that the decision was made prior to the sending of the intent letter, on the ground that the intent letter reflects that a decision has already been made." Id. at 392, 392 n.31.   The court also reasoned that the plaintiff's "opportunity to discuss and dispute the report to exactly the scenario envisioned by the FCRA" and thus did not violate the statute.  Id.

In response, Manuel argues that, when "Wells Fargo determines that the applicant is not eligible because of the consumer report...[and] sends a message to First Advantage to code the consumer's file at First Advantage as 'ineligible'", it has committed an adverse action under the FCRA.   Id. at 14. Manuel argues several points in support of his position.  First, he notes that the "catch all" definition of "adverse action" found in §1681a(k)(1)(B)(iv) is not limited "only to the ultimate communication of a denial of employment to the consumer applicant."  Docket No. 70 at 15.   Instead, it defines "adverse action" as "an action taken or determination that is made...[that is] adverse to the interests of the consumer."  Id. This is a very broad definition that, according to Manuel, encompasses Wells Fargo's actions.

Second, Manuel argues that "the facts in this case do not suggest [that the alleged adverse action was] an 'internal'

24

decision." Id. Rather, "Wells Fargo affirmatively and without qualification communicated its decision to a third party...thereby setting in motion an automated process to electronically bar the Plaintiffs from employment and to send a staggered set of rejection notices to the consumer." Id. at 15-16. Third, Wells Fargo notes that the entry of the code was the only action taken by Wells Fargo during this process, and thus it cannot qualify as a "preliminary" action. Id. at 16.

Manuel relies in part on Goode v. LexisNexis Risk & Info. Analytics Grp., Inc., 848 F. Supp. 2d. 532, 538 (E.D. Pa. 2012) that rejected the reasoning advanced by Wells Fargo.[8] In Goode, the court held that the defendant, a consumer reporting agency, had taken an "adverse action" under the FCRA when it provided a report to an employer and also adjudicated the subjects' eligibility on behalf of the employer, sending the employers an evaluation that the Court considered "quite literally, a decision for employment purposes" because "there was no real opportunity for plaintiffs to contest the adjudication or change

---

[8] Manuel also cites to Beverly v. Wal-Mart Stores, Inc., 2008 WL 149032 (E.D. Va. 2008) in support of his argument. However, the facts of that case are not analogous to those in this case. In Beverly, the defendant argued that both the pre-adverse action and the adverse action notices were not "adverse actions" under the FCRA because the Defendant subsequently rescinded its rejection and offered the Plaintiff a position. Beverly, 2008 WL 149032, at *3. The Court rejected that argument, holding that an adverse action was taken when the defendant sent Plaintiff a final adverse action noticed because the letter indicated "a firm decision to deny plaintiff employment." Id.

its outcome thereafter" and because there was no evidence that "employers ever learned [if] plaintiff disputed the adjudications." 848 F. Supp. 2d at 539-40. In distinguishing Obabueki, the court noted that the "employers in this case [did] not conduct any analysis or engage in any decision-making after defendant adjudicates the employee or prospective employee." Id. at 540.

Manuel argues that,"[w]hen Wells Fargo 'adjudicates' the criminal background reports and communicates its decision to First Advantage, it is engaging in decision-making activity." Docket No. 70 at 17. He states that the process of deciding whether the employee is ineligible is not "preliminary" as Wells Fargo labels it, but instead is final. Id. This finality "is evident when one considers that the single act of coding an applicant as ineligible for employment serves as the basis for First Advantage sending both its so-called Pre-Adverse Action notice and its Adverse Action Notice." Id.

### a. Analysis

"The FCRA 'expressly allows for the formation of an intent to take adverse action before complying with § 1681b(b)(3) because it states that 'the person intending to take' adverse action must provide the report and description of rights' prior to taking the adverse action." Javid v. SOS Interational, LTD, 2013 WL 2286046 at *4 (E.D. Va. 2013) (quoting Obabueki, 145 F.

Supp. 2d at 392.). "The formation of such intent, therefore, cannot be the adverse action itself." Id. The question in this instance is whether a reasonable jury could determine that Wells Fargo took an "adverse action" against Manuel and other class members when it entered the "ineligibility" code into First Advantage's system, thus triggering the sending of the two FCRA letters.

Whether or not a reasonable jury could determine that Wells Fargo's act of coding an applicant as ineligible was an adverse action under the FCRA is a fact question. There is evidence that weighs in favor of either side. In Wells Fargo's favor, the case law seems to clearly establish that a company can, and indeed must, form an intent to take an adverse action before notifying an applicant that it may take such an adverse action. It would be impossible for a company to notify a consumer of a potential adverse action without first determining that said consumer likely does not qualify for a position based, in part, on a consumer report.

The language in the letter titled "Pre-Adverse Action Notice" states that a "decision is currently pending concerning your application for employment or continued employment at Wells Fargo." Docket No. 70-15 at 3. It notifies the recipient that he "should contact First Advantage immediately...[i]f this report contains any information that is inaccurate or

incomplete...so that the corrected information can be reviewed prior to an employment decision being made." Id. The "Adverse Action Notification", sent five days later, states that "Wells Fargo regrets to inform [the recipient] that based on their hiring criteria, they are unable to consider [the recipient] further for an employment opportunity with its organization." Id. at 2. The letter makes it clear that the decision not to hire is final, as opposed to the "pending" decision not to hire referenced in the Pre-Adverse Action Notice.

Additionally, recipients of the letter had a meaningful opportunity to dispute the consumer report after the pre-adverse action letter was sent, as evidenced by the fact that Manuel did, in fact, initiate such a challenge after he received the pre-adverse action letter. This indicates that the hiring decision was not final because Wells Fargo was willing to investigate any background checks or applications that a consumer believed were incorrect or unfair.

However, as Manuel contends, Wells Fargo's use of the ineligibility code was the only communication that Wells Fargo made to First Advantage about the applicant unless the applicant disputed the background check after he received the "pre-adverse action notice." A reasonable jury could find that Wells Fargo's adverse hiring decision was final when it was first relayed to First Advantage because Wells Fargo was comfortable adhering to

28

that decision without reviewing it if the individual did not file a dispute.

Because there is sufficient evidence to support a reasonable jury's finding that Wells Fargo's actions were "adverse actions," and the issue is one for the finder of the fact. Therefore, the motion for summary judgment on Count Two will be denied.

## IV.  Consumer Report Requirement

Wells Fargo next argues that it did not procure "consumer reports" within the meaning of the FCRA and thus that its background checks were not subject to the FCRA requirements. Therefore, Wells Fargo seeks summary judgment on Counts One and Two.

### a. Legal Standard

The applicability of both § 1681b(b)(2)(A) and § 1681b(b)(3) is limited to actions involving consumer reports. See § 1681b(b)(3) ("...in using a consumer report for employment purposes…"); § 1681b(b)(2)(A) ("...a person may not procure a consumer report, or cause a consumer report to be procured..."). "The term 'consumer report' means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to

be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for: (A) credit or insurance to be sued primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under §1681b of this title." 15 U.S.C. § 1681a(d)(1).

§ 1681a(d)(2) excludes certain background checks from the definition of a "consumer report" under the FCRA. §1681a(d)(2)(D) is the pertinent section for the purposes of this motion. That section states that "...the term 'consumer report' does not include...a communication described in subsection (o) or (x) of this subsection." The Editor's Notes for §1681a state that "Subsection (x) of this section, referred to in subsection (d)(2)(D), was re-designated subsection (y) of this section by Pub. L. 111-203, Title X, §1088(a)(1), July 21, 2010, 124 Stat. 2086." Thus, the subsection should be interpreted as that "...the term 'consumer report' does not include...a communication described in subsection (o) or [(y)] of this subsection."

§ 1681a(y) excludes certain reports from the FCRA definition of a consumer report and reads as follows:

> 1) **Communications described in this subsection.—** A communication is described in this subsection if—

(A) but for subsection (d)(2)(D) of this section, the communication would be a consumer report;

(B) the communication is made to an employer in connection with an investigation of—

(i)     suspected misconduct relating to employment; or

(ii)    compliance with Federal, State, or local laws and regulations, the rules of a self-regulatory organization, or any preexisting written policies of the employer;

(C) the communication is not made for the purpose of investigating a consumer's credit worthiness, credit standing, or credit capacity; and

(D) the communication is not provided to any person except—

(i)     to the employer or an agent of the employer;

(ii)    to any Federal or State officer, agency, or department, or any officer, agency, or department of a unit of general local government;

(iii)   to any self-regulatory organization with regulatory authority over the activities of the employer or employee;

(iv)    as otherwise required by law; or

(v)     pursuant to section 1681f of this title.

### b. Parties' Arguments

Wells Fargo argues that the background checks that it procured during the employment application process fall under § 1681a(y) and thus are excluded from the definition of a "consumer report" under § 1681a(d)(2)(D). Both the FIRREA and the HFSH Act place restrictions on the type of individuals who may be employed by banking institutions. Wells Fargo argues that "any background check reports obtained by Wells Fargo were by definition obtained 'in connection with an investigation of' the applicant or current team member's current 'compliance with Federal, State or local laws and regulations,' as well as ensuring Wells Fargo's compliance with the aforementioned laws and its reasonable inquiry obligation." Id.

Wells Fargo relies heavily on Martin v. First Advantage Background Services Corp[9] in making its argument. Id. The plaintiff in that case had brought FCRA claims against Wells Fargo and First Advantage and the defendants had moved to dismiss those claims on the grounds that the background check did not qualify as a "consumer report" under §1681a(y). On defendants' motion for summary judgment, the Court held that the

---

[9] Wells Fargo has cited to, and primarily quoted, the Martin court's 2012 opinion, the Martin court actually denied Wells Fargo's motion to dismiss on the "consumer report" argument because it held that the issue was proper, instead, for summary judgment. 877 F. Supp. 2d 754 (D. Minn. 2012). Summary judgment was granted by the court in 2014. 2014 WL 1260392 (D. Minn. 2014).

"FCRA [did] not apply...because the Report [was] exempt from FCRA pursuant to 15 U.S.C. §1681a(y)."  Id. at *6.  It stated that the "evidence adequately show[ed] that the Report was made in an effort to comply with federal law [and] [a]ccordingly, the exemption from the FCRA applie[d]."  Id.

Finally, Wells Fargo argues that the fact that the summary reports it received were labeled "consumer reports" should not impact the analysis.  It argues that any impact of those words on the Court's analysis "would exalt form over substance and ignore the venerable principal that the legal effect of a document cannot be determined by labels alone."  Id.

Manuel opposes Wells Fargo's position, making four main arguments against it.  First, he argues that the plain language of § 1681a(y) requires that "there be an investigation independent of the communication" because the statute states that the communication must be "made to an employer in connection with an investigation."  Docket No. 70 at 19. Second, Manuel argues that § 1681a(y) applies only to a certain type of investigation – namely, that the investigation must be one "of compliance" and the investigations here at issue are different than one meant "to ensure compliance."  Id. at 22. Third, Manuel argues that the "documents and process used by Wells Fargo admits to FCRA governance" and that § 1681a(y) does not apply because Wells Fargo has admitted to "providing copies

33

of routine background reports to applicants and employees before taking adverse action." Id. at 23. Finally, Manuel argues that Wells Fargo's position is inconsistent with legislative and regulatory history. Id.

Manuel also contends that the decision in Martin is of no force here because the Martin case "is devoid of any analysis of the statute's text", particularly the "in connection with an investigation" language. Id.

Manuel then points the Court to Newton v. Bank of America, N.A., 2015 U.S. Dist. LEXIS 62930 (C.D. Cal. 2015), in which the court evaluated and rejected the § 1681a(y) argument. In Newton, the court analyzed the text of § 1681a(y) and concluded that the "text of the Exclusion [was] limited by the term 'investigation'...[which] is interpreted according to its ordinary meaning." Id. at *12. The court then held that the defendant's practice of requiring all applicants to undergo a background check was "not an 'investigation' within the plain language of the Exclusion" because said background checks were conducted pursuant to a written policy establishing a background check as a mandatory condition for employment, rather than an investigation" which it defined as "a systematic or official inquiry into [Defendant's] compliance with federal laws and written policies." Id. at *12-14.

34

### a. Analysis

It is clear from the plain language of §1681a(y) that a background check must be procured "in connection with an investigation" in order to fall within the statute's exception. More particularly, the background check itself cannot be the investigation, but must rather be a part of a larger inquiry. While there is no precedent defining "investigation" for the purposes of §1681a(y), the Fourth Circuit has spoken about the definition of "investigation" within the FCRA as a whole.   In Johnson v. MBNA America Bank, NA, the Fourth Circuit determined that the term "investigation" was "unambiguous" and thus must be defined according to the plain meaning of the term.   Id. at 430. It held that, because "investigation...is defined as 'a detailed inquiry or systematic examination'...the plain meaning of 'investigation' clearly requires some degree of careful inquiry by creditors."   Id. (internal citations omitted).[10]

"In interpreting a statute, [the Court] must first determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case...The plainness or ambiguity of statutory language is

_____

[10] The statutory language at issue in Johnson stated that "[a]fter receiving notice...of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall...conduct an investigation with respect to the disputed information."   15 U.S.C. §1681s-2(b)(1)(A).

determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Id. (citing Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)). Here, there is nothing in the statutory language that indicates that "investigation" is being used in an ambiguous or confusing manner. Thus the language is "plain and unambiguous" and must be construed according to its ordinary meaning. Therefore, the Fourth Circuit's definition, which requires an investigation to have "some degree of careful inquiry" applies.

Wells Fargo's background check process does not fall within the definition of "an investigation" as that terms is defined in the Fourth Circuit. On an individual level, the only inquiry in which Wells Fargo engages respecting whether an individual qualifies for employment under the banking regulations involves requesting the actual background check from First Advantage and looking at that background check. There is no greater "careful inquiry" into the individual's criminal history that would qualify the process as an "investigation" under § 1681a(y).

Wells Fargo's response to the Fourth Circuit's definition is that the Court cannot consider the process on an individual level, but rather must consider the background checks as a part of "its enterprise-wide compliance with a number of federal laws." Docket No. 73 at 9. That argument has no merit because,

36

under Wells Fargo's view, no employer would have to comply with the FCRA as long as some part of the background checking process helped them to comply with a federal law.  For example, the banking industry would never be subject to the FCRA when using a background check for employment purposes because the requirements of the FIRREA apply to all employees.  Thus, every background check conducted on every applicant and employee would, under Wells Fargo's rationale, be exempted from the FCRA because it cannot employ people with certain kinds of convictions.  Thereupon, the exception would swallow the rule with respect to employment uses of background checks under the FCRA, because there are a number of federal, state, and local laws excluding certain individuals from certain types of employment.

There is further evidence supporting a finding that Wells Fargo's background checks qualify as consumer reports under the FCRA.  First, Wells Fargo does not limit its background check process to those convictions that would disqualify an applicant or employee for a particular position.  Wells Fargo's consent form indicates that the report that is produced "could include information about [the applicant's] criminal history, academic achievement, employment history, Social Security Number verification, character, general reputation, personal characteristics, and mode of living."  Docket No. 70-8.  Such a

37

broad-reaching background check would not have been necessary for any "investigation" into Wells Fargo's compliance with the FIRREA or FHSTA. This further supports the conclusion that the background check at issue here is a "consumer report" as contemplated by the FCRA.

Second, although Wells Fargo is correct in asserting that the titles of forms and contracts are not binding, the contents thereof can be informative. The facts show that the contract between First Advantage and Wells Fargo was executed with the expectation that any report produced would be used "solely for employment purposes and for no other purpose." Docket No. 70 at 5. That document further elaborates that Wells Fargo would be required to comply with the FCRA for each requested report. Id. at 5-6. Further, the standard consent form used by Wells Fargo informed the applicant that "Wells Fargo...intend[ed] to procure an investigative consumer report on their background" and provided a brief explanation of the individual's rights under the FCRA. Docket No. 70-2. The "Pre-Adverse Action" and "Adverse Action" letters also referenced the FCRA and the recipients rights under the law. Docket No. 70-15. That evidence shows that, at the time these records were being produced, even Wells Fargo perceived that it was procuring a consumer report that fell under the FCRA's umbrella.

38

Finally, the <u>Martin</u> decision is not persuasive.  The court in <u>Martin</u> conducted no statutory analysis and instead only summarily declared that the "FCRA [did] not apply...because the Report [was] exempt from [the] FCRA [because]...it was made to comply with the SAFE Act."  <u>Martin</u>, 2014 WL 1260392, at *6.  The district court did not analyze the different requirements of the statute and did not seen to note that an "investigation" was required in conjunction with the background report.  Further, the facts in <u>Martin</u> indicate that the background check conducted in that case was different than those conducted by Wells Fargo here.  In the summary of facts, the court indicated that the plaintiff "was told that he had to submit to a background check in order for Wells Fargo to comply with the SAFE Act."  <u>Id.</u> at *2.  The court also noted that the background report "was made to comply with the SAFE Act, as evidenced by Plaintiff and Wells Fargo employees."  <u>Id.</u> at *6.  Thus, it appears that the background check was used <u>only</u> for the purpose of complying with the SAFE Act (as opposed to the purpose of determining eligibility for employment in general), and may have been limited to the convictions of concern for that statute.

## II. **Willfulness**

Wells Fargo's final argument in favor of summary judgment is that Manuel cannot prove that its behavior constituted a

willful violation of the FCRA and, because Manuel's complaint only alleges a willful violation, summary judgment is proper.

### a. Legal Standard

A defendant acts willfully under the FCRA by either knowingly or recklessly disregarding its statutory duty." Singleton, 2012 WL 245965, at *4 (citing Safeco Ins. Co. v. Burr, 551 U.S. 47, 57-60 (2007)). "Recklessness...consists of 'action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" Syed v. M-I LLC, 2014 WL 4344746, at *2 (E.D. Ca. 2014) (quoting Safeco, 551 U.S. at 49). "In other words, 'a company subject to the FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.'" Id. (quoting Safeco, 551 U.S. at 50). The Supreme Court has "held that a defendant's violation of the FCRA is not reckless simply because its understanding of its statutory obligations is 'erroneous'; instead, a plaintiff must allege, at minimum, that the defendant's reading of the FCRA is 'objectively unreasonable.'" Id. (citing Safeco, 551 U.S. at 69).

Summary judgment is very rarely appropriate on the issue of defendant's willfulness. However, when the plaintiffs have

produced no evidence speaking to defendant's willfulness, it is appropriate to consider granting defendant's motion.  See Dalton v. Capital Assoc. Indus. Inc., 257 F.3d 409, 418 (4th Cir. 2001) (Granting summary judgment noting that "summary judgment is 'seldom appropriate' on whether a party possessed a particular state of mind [but] evidence that [defendant] acted willfully is wholly lacking."); Robinson v. Equifax Information Services, LLC, 560 F.3d 235, 241 n.3 (4th Cir.) (rejecting Plaintiff's appeal on the entry of summary judgment on the issue of willfulness because "evidence that[Defendant] acted willfully was wholly lacking."); Hill v. Equifax Information Servs., LLC, 974 F.Supp. 2d 865, 876-77 (M.D.N.C. 2013) ("Plaintiff has presented evidence of numerous mistakes by Defendant...However...Plaintiff has failed to present any evidence of willful conduct as required by 1681n.  Plaintiff's speculation is not sufficient to rebut sworn testimony directed at the actual procedures employed in the interactions between Plaintiff and [Defendant]."

### b. Parties' Arguments

Wells Fargo argues that its interpretations of § 1681b(b)(3)(A), § 1681b(b)(2)(A), and § 1681a(y) were not objective unreasonably and thus that any violation was not willful.  With reference to § 1681b(b)(3)(A), Wells Fargo argues that its interpretation "was not objectively unreasonable in

light of Obabueki and its progeny...which held, under analogous facts, that the employer did not engage in adverse action before it sent the plaintiff a pre-adverse action notice." Docket No. 58 at 29. It argues this was a "plausible" interpretation under the law.

As to § 1681b(b)(2)(A), Wells Fargo argues that its interpretation "was not objectively unreasonable in light of prior cases holding...that disclosure and authorization forms may contain liability waivers without violating the FCRA." Id. at 30. Wells Fargo is referring to Smith v. Waverly Partners, 2012 WL 3645324 (W.D.N.C. 2012), in which the court held that a liability waiver within an FCRA disclosure and authorization form was ineffective but not violative of the FCRA's requirements, and its progeny. Further it cites to Syed v. M-I LLC, 2014 WL 4344746, at *3 (E.D.C.A. 2014), which held that "[t]he inability of district courts around the country to agree on whether a combined disclosure and liability release violates the FCRA suggests that the statute is 'less than pellucid.'"   .

Manuel argues that the issue of Wells Fargo's willfulness is not a proper one for summary judgment. Docket No. 70 at 34. First, Manuel argues that Wells Fargo's approach under §1681b(b)(2)(A) "ignores the plain statutory text" of the section and states that "there is nothing ambiguous or confusing about §1681b(b)(2)(A)(1)." Id. at 37. Thus, any interpretation

by Wells Fargo that permitted it to include a waiver of rights within the FCRA disclosure, under Manuel's argument, would be per se unreasonable and thus a willful violations. Manuel further points out that "both the courts and the FTC have recognized that the inclusion of a waiver of rights provision in the FCRA mandated Disclosure/Consent form violates § 1681b(b)(2)(A)" and that such consensus bolsters his case. Id.

Manuel next argues that Wells Fargo's interpretation of § 1681b(b)(3) is also objectively unreasonable, thus rendering its behavior willful under the FCRA. Id. at 38. Manuel argues that the Obabueki and Javid cases that Wells Fargo relies upon are "factually distinguishable" from the case at bar and thus it was "objectively unreasonable" for Wells Fargo to rely upon them. Id. Finally, Manuel argues that Wells Fargo's interpretation of § 1681a(y) was objectively unreasonable, stating that a "reading of [§ 1681a(y)] requires only an understanding of two words – 'communication' and 'investigation' – and two phrases – 'in connection with' and 'an investigation of compliance.'" Id.

### a. Analysis

Whether Wells Fargo acted willfully with respect to § 1681b(b)(2)(A) and § 1681b(b)(3) is a question of fact best reserved for a jury. As to § 1681b(b)(2)(A), there is, indeed,

conflicting precedent on the issue of whether inclusion of a wavier in a § 1681b(b)(2)(A) disclosure violates the FCRA. This suggests that, to some extent, the statutory language is "less than pellucid" in light of the judicial interpretations thereof and thus that a violation thereof was not willful. However, while Wells Fargo has pointed to several cases that support its position, there is no evidence that anyone at Wells Fargo ever relied upon those opinions in drafting its disclosure and waiver form.

Additionally, there is no information in the record establishing when Wells Fargo began using the form at issue. If it began using the form at issue before any of the conflicting cases were decided, a reasonable jury likely could determine that an inclusion of a wavier clause was a willful violation of the FCRA. This Court has recently analyzed the language of § 1681b(b)(2)(A) in Milbourne, and found it to be quite clear in its requirement that a FCRA disclosure should not contain a waiver clause. 2015 WL 1120284 at *5-8. Thus, if Wells Fargo was relying only on the language of the statute in drafting its FCRA disclosure form (because, for example, the operative cases had not yet been decided), the inclusion of a waiver likely would be considered "unreasonable." The record is insufficient to allow a contrary conclusion and it is Wells Fargo's burden to

make such a record. It did not do so and that forecloses summary judgment.

As to § 1681b(b)(3), while Wells Fargo has pointed to several cases that support its position, it has presented no evidence establishing when its practices began and whether or not it knew of the cases on point when drafting its guidelines. Wells Fargo's § 1681(y) argument fails for similar reasons. Thus, Wells Fargo has failed to establish that it is entitled to summary judgment as a matter of law on the issue of willfulness, and its motion therefore must be denied.

## CONCLUSION

For the reasons set forth above, Defendants' MOTION FOR SUMMARY JUDGMENT (Docket No. 57) will be denied.

It is so ORDERED.

_____/s/_____ *REP*

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: August _19_, 2015