IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

TERRELL MANUEL,

     Plaintiff,

v.                              Civil Action No.: 3:14CV238

WELLS FARGO BANK,
NATIONAL ASSOCIATION,

     Defendant.

## MEMORANDUM OPINION

This matter is before the Court on PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (Docket No. 59).  For the reasons set forth below, the motion will be granted in part and denied in part.

### BACKGROUND

#### A. PLAINTIFFS' CLAIMS

On April 1, 2014 plaintiffs Terrell Manuel ("Manuel") and Charles White ("White") filed a class action complaint on behalf of themselves and all others similarly situated alleging that defendant Wells Fargo Bank, N.A. ("Wells Fargo") had violated the Fair Credit Reporting Act ("FCRA").  Docket No. 1.  That complaint was amended three times, and the operative complaint

at this time is the Third Amended Class Complaint ("TAC"). Docket No. 41.

The TAC alleges two counts under the FCRA. Count One alleges a violation of §1681b(b)(2)(A), which requires that "a person may not procure a consumer report, or cause a consumer report to be procured, for employment purposes with respect to any consumer, unless: (i) a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, in a document that consists solely of the disclosure, that a consumer report may be obtained for employment purposes; and (ii) the consumer has authorized in writing (which authorization may be made on the document referred to in clause (i)) the procurement of the report by that person."

Count Two alleges that Wells Fargo violated §1682b(b)(3)(A)(i) of the FCRA. §1681b(b)(3)(A)(i) requires that "in using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates: (i) a copy of the report; and (ii) a description in writing of the rights of the consumer under this subchapter, as presented by the Bureau under section 1681g(c)(3) of this title."

Plaintiffs filed this Motion for Class Certification on April 30, 2015.  Docket No. 59.  Defendants have opposed the motion.  Docket No. 65.  Plaintiffs have replied.  Docket No. 68.  On July 20, 2015, the parties agreed that a hearing was not necessary on this motion.  It will be decided on the briefing submitted.

### B. Factual Background[1]

#### a. Facts Regarding Plaintiff Manuel[2]

On January 30, 2012, Manuel completed an online application for a position as an open loan document specialist at Wells Fargo.  Docket No. 60 at 11.  On or about February 24, 2012, Manuel completed an interview with Wells Fargo personnel and was offered the position conditioned upon the successful completion of a background check.  Id.  He was given an offer letter that he signed and returned.  Id.  On February 25, 2012, pursuant to

---

[1] A large portion of what the parties label as "factual background" is, in fact, legal argument about the validity of Manuel's claims.  As class certification does not ask about the merits of plaintiff's claims, but rather determines whether class certification is appropriate, these portions of the parties' briefs are not addressed unless germane to the class certification issue.

[2] Plaintiffs have agreed that White is not a proper representative for the class, nor is he a class member.  Docket No. 68.  Thus, the individual facts of his case are not relevant to this analysis.  White retains an individual claim and his case has been severed.

Wells Fargo's instructions, Manuel accessed the First Advantage[3] website and filled out two forms: the "Wells Fargo Standard Application" and the "Wells Fargo Standard Consent". Id. This initiated a criminal background screening process which was completed on April 3, 2012. Id.

On April 3, 2012 (the day the background screening was completed), Manuel received a telephone call from a Wells Fargo representative who informed Manuel that he did not qualify for the job because of the contents of his background report. Id. On April 11 or 12, 2012, Manuel received a letter that referred to itself as a Pre-Adverse Action Notice and was dated April 3, 2012. Id. That letter included a copy of his background report and an FCRA Summary of Rights. Id. After Manuel received the Pre-Adverse Action Notice, he "undertook the appeal/dispute process contained therein and faced First Advantage a written dispute to the contents of his Pre-Employment/Security Screening." Docket No. 65 at 4 (citing Manuel Dep. at 82:13-20, 83:15-18). First Advantage then generated a revised report, which still contained the convictions at issue. Id. Wells Fargo contends that only then did it determine "on June 28, 2012 that Manuel was ineligible for employment with Wells Fargo." Id.

---

[3] First Advantage conducts background checks for Wells Fargo.

4

### b. Wells Fargo's Procurement and Use of Consumer Reports

The parties have stipulated to the following facts (<u>see</u> Docket No. 43):

> 1. Stipulation One: After March 1, 2010, Wells Fargo's standard policy and procedure for using criminal background screenings in regards to current and prospective employees in its Home Mortgage Business Line was as follows:
>
> a. Wells Fargo refers individuals subject to criminal background screenings to a website operated by First Advantage Background Services Corporation. Such individuals use this website to complete a number of application forms, including disclosure and authorization forms related to the criminal background screening. After all application forms are completed First Advantage Background Services Corporation generates the criminal background screening report and provides its findings to Wells Fargo. Specifically, First Advantage enters the criminal background screening report into a database to which both First Advantage and Wells Fargo have access.
>
> b. Members of Wells Fargo's Background Screening Compliance Team then review the results to make a determination as to whether the current or prospective employee was ineligible for the relevant employment position in whole or in part because of the content of the criminal background check. If the reviewing members of the Background Screening Compliance Team believe that the individual in question would not meet employment eligibility requirements for the position to which he or she applied based in whole

5

or in part on the contents of his or her criminal background screening report, the reviewing members would then access the database to which both First Advantage and Wells Fargo have access and enter a code or other notation that the applicant would not be eligible for the employment position based in whole or in part on the contents of his or her criminal background screening report. Upon the entry of this coding, First Advantage generates and sends a notice, with the title "Pre-Adverse Action Notice", which was substantially similar at all relevant times to the ones sent to Plaintiffs Manuel and White, and mails it, along with an FCRA Summary of Rights Notice and a copy of the current or prospective employee's criminal background screening results, to the current or prospective employee. If the current or prospective employee does not appeal or dispute the results of his or her criminal background screening during the next five business days after the first notice is mailed, First Advantage generates and sends the applicant or employee an Adverse Action Notice, which was substantially similar at all relevant times to the ones sent to Plaintiffs Manuel and White.

2.  Stipulation Two: During the putative class period, at least 1000 current or prospective employees associated with Wells Fargo's Home Mortgage Business Line were subjected to the process described in Stipulation One.

3.  Stipulation Three: During the putative class period, at least 1000 current or prospective employees associated with Wells Fargo's Home Mortgage Business Line were notified by Wells Fargo, either in person or via telephone, communicating that the current or prospective applicant's criminal background screening report contains records

6

that may preclude employment with Wells Fargo before Wells Fargo or First Advantage generated and mailed a Pre-Adverse Action Notice along with an FCRA Summary of Rights Notice and a copy of the applicant's criminal background screening results.

4. Stipulation Four: Wells Fargo retains detailed employment and application records related to all individuals who were rejected for employment based in whole or in part on the contents of a criminal background screening obtained from First Advantage Background Services Corporation. In the event that any class is certified in this case, Wells Fargo can identify these current or prospective employees described in Stipulations One, Two, and Three for the relevant time period.

According to Manuel, Wells Fargo has admitted that all putative class members signed a standard FCRA authorization and disclosure form which included waiver language stating: "You hereby release the Company, First Advantage and all Third Parties to the full extent permitted by law, from any liability or claims arising from retrieving and/or reporting information concerning you and/or from using the Report for employment purposes." Docket No. 60 at 3-5; Docket No. 60-1; Docket No. 60-2, Int. 10-11.

In addition to the Joint Stipulations filed with this Court, Wells Fargo also provided a detailed description of its background check process in a Fed. R. Civ. P. 30(b)(6) deposition of Timothy Brain. Docket No. 60 at 9; Docket No. 60-

7

6.   The same process was used in Wells Fargo's Mortgage Business Line and in other business lines.  Brain Dep., Docket No. 60-6, at 39:16 – 40:17.   In that deposition, Brain, as corporate designee, explained the process as follows:  First, Wells Fargo requests a background check from First Advantage.   After a background check is run, First Advantage's computer will automatically notify Wells Fargo "if there are findings that are available on the report that could potentially disqualify" the subject of the report.  Id. at 69:16-25.  If a report has been flagged in this way, it is reviewed by a Wells Fargo employee to determine if the applicant qualifies for employment at Wells Fargo.   Id. at 73:5-14, 82:2-12.   This process is called an "adjudication".

After the "adjudication" has been completed, and if the employee is rendered ineligible, the Wells Fargo employee access the First Advantage website and enters a code that indicates that the applicant has been adjudicated to be ineligible.  Id. at 82:13-17.   Wells Fargo calls this a "preliminary" determination, but Manuel argues that it is the only decision "made and taken by Wells Fargo" unless the applicant disputes the determination and thus that it is unfair to call it a preliminary determination.  Id.; Docket No. 60 at 9-10.

Once Wells Fargo enters the ineligibility code into the

8

First Advantage computer system, First Advantage generates and sends a letter labeled a "Pre-Adverse Action" notice to the applicant. Brain Dep. at 82:18-83:6; 85:5-86:1. If no action is taken in the next five business days, First Advantage's system automatically prints and mails a second letter labeling the "Final Adverse Action Notice." Id. This automatic mailing can be stopped if the applicant disputes the first letter within five days after the mailing of the first letter. Id. This process is standard for all Wells Fargo employees. Id. at 40:4-21.

## C.   The Proposed Class and Class Claims

Manuel seeks to certify two classes. The first class, which Manuel calls the "Impermissible Use Class", is defined as follows:

> All natural persons residing in the United States (including all territories and other political subdivisions of the United States), who applied for an employment position with Defendant or any of its subsidiaries within the two years immediately preceding the filing of the Complaint in this matter on April 1, 2014, and as part of this application process were the subject of a consumer report obtained by Defendant, and to whom Defendant attempted the disclosures required at 15 U.S.C. §1681b(b)(2)(A) through the First Advantage forms and/or portal.

Plaintiff's Memorandum in Support of Motion for Class Certification, at 12.

9

The second proposed class, which Milbourne calls the "Adverse Action Class" (and identifies as "really a subclass"), is defined as follows:

> All natural persons residing in the United States (including all territories and other political subdivisions of the United States), who applied for an employment position with Defendant or any of its subsidiaries within the two years immediately preceding the filing of the Complaint in this matter on April 1, 2014, and as part of this application process were the subject of a consumer report obtained by Defendant, (a) against whom Defendant took an adverse employment action based in whole or in part on the report; (b) and to whom Defendant did not provide a copy of the consumer report as stated at 15 U.S.C. §1681b(b)(3)(A) at least five business days before the date the consumer report at First Advantage was first coded as ineligible for hire.

Id. at 13.   Count One of the Class Complaint is asserted on behalf of the "Impermissible Use Class" and Count Two of the Class Complaint is asserted on behalf of the "Adverse Action Class".   Docket No. 41, 15-20.

## CLASS CERTIFICATION DISCUSSION

To obtain class certification, a plaintiff must satisfy the four requirements of Fed. R. Civ. P. 23(a).   Additionally, the case must be consistent with at least one of the types of class actions defined in Fed. R. Civ. P. 23(b) and their requirements. Because Manuel proposes two different classes for certification,

each requirement will be addressed in the context of each individual class. Wells Fargo does not contest that the Numerosity or Superiority elements are satisfied for either class.

## A. Rule 23(a)

Rule 23(a) has four requirements for class certification. They are that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the representative's claims or defenses are typical of those of the class; and (4) the representative will fairly and adequately represent the interests of the class. See Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 337 (4th Cir. 1998.) The plaintiff bears the burden of proving all requirements of Rule 23. Lienhart v. Dryvit Systs., Inc., 255 F.3d 138, 146 (4th Cir. 2001).

As the Fourth Circuit explained in 2004, the Court is not required "to accept plaintiffs' pleadings when assessing whether a class should be certified." Gariety v. Grant Thornton, LLP, 368 F.3d 356, 365 (4th Cir. 2004). Rather, "the district court must take a 'close look' at the facts relevant to the certification question and, if necessary, make specific findings on the propriety of certification." Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 319 (4th Cir. 2006) (quoting

11

*Gariety*, 368 F.3d at 365). "Such findings can be necessary even if the issues tend to overlap into the merits of the underlying case," but "[t]he likelihood of the plaintiffs' success on the merits . . . is not relevant to the issue of whether certification is proper." *Id.* (internal citations omitted).

The Supreme Court recently elaborated further upon the factual determinations at the class certification stage in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. ___, 131 S. Ct. 2541 (2011). In *Dukes*, the Supreme Court explained:

> Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc. We recognized in *Falcon* that 'sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question,' and that certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'

131 S. Ct. at 2551 (quoting *Falcon*, 457 U.S. at 160-61 (emphasis in original)). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." 131 S. Ct. at 2551.

After *Dukes*, which "laid the groundwork for the heightened 'rigorous analysis' required of a class certification petition

12

that 'will entail some overlap with the merits of the plaintiff's underlying claim,'...the Supreme Court issued a pair of 2013 opinions clarifying the extent to which a court can address merits issues at the class certification stage." Timothy Coughlin & Barbara A. Lum, Digging Deeper: Mass Toxic Tort Class Certification After Dukes, Comcast, and Amgen, 80 Def. Couns. J. 428, 432 (Oct. 2013). The first of these decisions was Amgen Inc. v. Connecticut Retirement Plans and Trust Funds, 113 S. Ct. 1184 (2013). In Amgen the Court clarified that, "[a]lthough we have cautioned that a court's class-certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent -- but only to the extent -- that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Id. at 1194-95 (internal citations omitted). "Thus, Amgen appears to limit inquiry into a case's merits where the class certification inquiry touches upon an indispensable element of the claim and on which a failure of proof would end the case." Coughlin and Lum, at 432 (internal citations omitted).

13

The second class certification case of 2013 was Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013). In Comcast, the Supreme Court further clarified "that the 'rigorous analysis' required for class certification reaches not only to issues of liability, but also to damages and causation." Coughlin & Lum, at 432. When considered in conjunction with Dukes, Comcast "suggest[s] that courts are now obligated to conduct a 'rigorous analysis' of an expert's data and methodology at the class certification stage...To the extent that the expert's methodology is 'arbitrary' or 'speculative,' courts can reject the expert's opinion and deny class certification." Id. This position "reaffirms Dukes' pronouncement that district courts considering motions for class certification often must look beyond the pleadings to issues that overlap with the merits. But again, the extent to which a court must delve into the merits remains undefined." Id. at 433.

Newberg on Class Actions also analyzed two of the latest Supreme Court decisions, noting that Dukes "encourage[ed] merits review at certification," while a different majority in Amgen cautions against "free-ranging merits inquiries at the certification stage", and stating that merits questions "may be considered to the extent − but only to the extent − that they are relevant to determining whether the Rule 23 prerequisites

14

for class certification are satisfied." William B. Rubenstein, Newberg on Class Actions § 7:23 (5th ed. 2013).

Keeping in mind the Supreme Court's views in Dukes, Amgen, and Comcast, we examine the definition of the proposed class.

## 1. Violation of Agreement Between the Parties

As a preliminary matter, Wells Fargo argues that both class definitions "are fatally flawed from the outset because they run headlong into class counsel's representations to Defendant as well as enforceable agreements between the parties." Docket No. 65 at 10-11. According to Wells Fargo, Manuel agreed to "end fact discovery...and [limit]...this case to Wells Fargo's Home Mortgage Business Line only" in exchange for Wells Fargo's agreement to the joint stipulation of facts entered as Docket No. 43. Id. at 10. An evidentiary hearing was held on this issue on July 20, 2015. Docket No. 85. Therein, the Court determined that the parties had not come to any such agreement and that the class definition was not so restricted. Id. Thus, that argument is moot.

## 2. Ascertainability of the Proposed Class

Rule 23 states that "[a]n order that certifies a class action must define the class and the class claims, issues, or defenses." Fed. R. Civ. P. 23(c)(1)(B). This is in addition to the certification requirements listed in Rule 23(a). "The

15

definition of the class is an essential prerequisite to maintaining a class action." Roman v. ESB, Inc., 550 F.2d 1343, 1348 (4th Cir. 1976); see also Kirkman v. N.C. R. Co., 220 F.R.D. 49, 53 (M. D.N.C. 2004). "The court should not certify a class unless the class description is 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" Solo v. Bausch & Lomb Inc., 2009 WL 4287706, at *4 (D.S.C. Sept. 25, 2009) (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1760 (3d ed. 2005)).

In a recent decision, the Fourth Circuit explained that "[a] class cannot be certified unless a court can readily identify the class members in reference to objective criteria." EQT Production Co v. Adair, 2014 WL 4070457, *7 (4th Cir. 2014); see also Wm. Moore et al., 5 Moore's Federal Practice § 23.21[1] (3d ed.) ("A class action is possible only when the class definition provides a court with tangible and practicable standards for determining who is and who is not a member of the class."). "The plaintiffs need not be able to identify every class member at the time of certification. But if class members are impossible to identify without extensive individualized fact-finding or 'mini-trials', then a class action is inappropriate." EQT, 2014 WL 4070457 at *7. Rather, "[f]or a

16

class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria." Moore, supra, § 23.21[3][a].  "Where the practical issue of identifying class members is overly problematic, the court should consider that the administrative burdens of certification may outweigh the efficiencies expected in a class action." Cuming v. S.C. Lottery Comm'n, 2008 WL 906705, *1 (D.S.C. 2008).

### a. The Impermissible Use Class

Manuel argues that the Impermissible Use Class satisfies the ascertainability requirement because Wells Fargo "has confirmed...that it and First Advantage retain detailed employment and application records and that, in the event that any class certified, it will be able to identify the class members."  Docket No. 60 at 16-17.  Wells Fargo does not argue that the Impermissible Use Class is not ascertainable.  Docket No. 65 at 10.

Wells Fargo has stipulated that it "retains detailed employment and application records related to all individuals who were rejected for employment based in whole or in part on the contends of a criminal background screening obtained from First Advantage Background Services Corporation."  Docket No. 43 at ¶4.  It has also admitted that, "[i]n the event that any

17

class is certified in this case, Wells Fargo can identify these current or prospective employees described in Stipulations One, Two, and Three for the relevant time period." Id. Stipulations One, Two and Three describe the process by which a criminal background check is conducted and adjudicated.[4] Id. at ¶¶ 1-3. Thus, the Impermissible Use class is readily ascertainable.

### b. The Adverse Action Class

Manuel initially argued that the Adverse Action Class is ascertainable for the same reasons the Impermissible Use Class is ascertainable. Docket No. 60 at 16-17. Wells Fargo contests ascertainability as to the Adverse Action Class. Docket No. 65 at 10.

Wells Fargo thates the view that "a necessary predicate to membership in [this] subclass is that Wells Fargo took an unspecified 'adverse action' based in whole or in part on a consumer report. Ascertaining membership in this class therefore requires this Court to undertake tens of thousands of mini-trials to determine what employment actions fit within the definition of 'adverse action' and, for those that qualify, why Wells Fargo took them." Id. The FCRA defines an adverse action

---

[4] As stated above, Mr. Brian's Rule 30(b)(6) deposition confirmed that the process reflected in the Joint Stipulations – limited to the Home Mortgage Line – is identical to the process undertaken for all potential employees. Thus, the factual statements made in the Joint Stipulations hold true for class members that fall outside of its explicit parameters.

as "a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee." 15 U.S.C. §1681a(k). While "a denial of employment" is simple to determine, Wells Fargo argues that the grey area introduced by "any other decision for employment purposes that adversely affect" the employee would require min-trials in each case. Id.

Manuel opposes Wells Fargo's argument for several reasons. Docket No. 68 at 5. First, he argues that there is no evidence "that the subject criminal background checks are used for any purpose other than to determine whether or not an applicant or employee will be 'rejected for employment'" as provided in the joint stipulations. Id. at 6. Thus, the only type of "adverse action" at issue is a rejection from employment. Second, Manuel argues that, if there were other "adverse actions", they are "made immaterial by other conditions within the putative class definition." Id. The "adverse action" is not the only requirement of the class – rather, the applicant must also have been "coded as ineligible for hire." Id. "Thus...[t]here would be no separate group [of plaintiffs] that was...employed and then later subjected to a lesser adverse action because of the First Advantage consumer report." Id. Finally, Manuel notes that the Court can amend or modify the class definition and

argues that "[a]t the very worst, the Court could certify a class that substituted 'rejected for employment' in place of 'adverse action' in the Adverse Action claim class definition." Id.

Wells Fargo has admitted that it keeps "detailed employment and application records related to all individuals who were rejected for employment based in whole or in part on the contents of a criminal background screening obtained from First Advantage Background Services Corporation." Docket No. 43 at ¶4. Manuel has represented to Court in his Reply that that the only type of adverse action that is possible within this class definition is a rejection from employment because of the "coded as ineligible for hire" language contained within the class definition. Docket No. 68 at 5-6. Manuel is correct in his assertions and that, in this context, "adverse action" is the equivalent of "rejected for hire" and nothing else. Thus, ascertainability is satisfied by the class definition as provide by Manuel, but to be certain, the class definition will use the term "rejected for employment."

### 2. Rule 23(a)(1) Numerosity

Rule 23(a)(1) provides that the second of the requirements for a class action is that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P.

23(a)(1).  "No specified number is needed to maintain a class
action under Fed. R. Civ. P. 23; [rather], application of the
rule is to be considered in light of the particular
circumstances of the case . . . ."  Cypress v. Newport News Gen.
& Nonsectarian Hosp. Ass'n, 375 F.2d 648, 653 (4th Cir. 1967)
(finding that a class of 18 was sufficient to fulfill the
numerosity requirement).  "Courts consider a number of factors
in considering whether joinder is practicable including the size
of the class, ease of identifying its numbers and determining
their addresses, facility of making service on them if joined
and their geographic dispersion."  Adams v. Henderson, 197
F.R.D. 162, 170 (D. Md. 2000) (internal quotation omitted).

Wells Fargo does not dispute that the numerosity
requirement is satisfied for either class.

### a. The Impermissible Use Class

Wells Fargo has stipulated that "at least 1000 current or
prospective employees associated with Wells Fargo's Home
Mortgage Business Line" were subjected to the background check
process described above.  (And the number is even greater for
all potential employees in Wells Fargo's other business lines as
to whom the process was used.)  This includes the act of signing
the waiver that is at issue in the Impermissible Use Class.

Docket No. 43 at ¶2. Thus, the numerosity requirement is easily satisfied.

### b. The Adverse Action Class

Wells Fargo has stipulated that "at least 1000 current or prospective employees associated with Wells Fargo's Home Mortgage Business Line were notified by Wells Fargo...that the current or prospective applicant's criminal background screening reports contains records that may preclude employment with Wells Fargo before Wells Fargo or First Advantage generated and mailed a Pre-Adverse Action Notice along with an FCRA Summary of Rights Notice and a copy of the applicant's criminal background screening results." Docket No. 43 at ¶3. (And, the number is even greater for all potential employees in Wells Fargo's other business lines as to whom the process was used.) Thus, the numerosity requirement is easily satisfied.

### 3. Rule 23(a)(2) Commonality

Rule 23(a)(2) requires that there be questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2); <u>Lienhart v. Dryvit Sys., Inc.</u>, 255 F.3d 138, 146 (4th Cir. 2001). The commonality requirement focuses on the claims of the class as a whole, and it "turn[s] on questions of law [or fact] applicable in the same manner to each member of the class." <u>Califano v. Yamasaki</u>, 442 U.S. 682, 701 (1979). To satisfy this

22

requirement, there need be only a single issue common to the class. See Cent. Wesleyan Coll. v. W.R. Grace & Co., 143 F.R.D. 628, 636 (D.S.C. 1992), aff'd 6 F.3d 177 (4th Cir. 1993). As noted previously herein, supra at 21-22, the Dukes decision focuses primarily on the issue of commonality. The decision states in part:

> Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury." This does not mean merely that they have all suffered a violation of the same provision of law.
>                              ***
> [The proposed class members'] claims must depend upon a common contention – for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

Dukes, 131 S. Ct. at 2551.

### a.   The Impermissible Use Class

Manuel alleges that his impermissible use claim satisfies the commonality requirement because it presents two common issues of law or fact, namely,: "(a) whether Wells Fargo's form and procedure violated §1681b(b)(2) because it included the illegal waiver...;and (b) whether these violations are willful." Docket No. 60 at 18. Wells Fargo does not assert that Manuel

23

cannot satisfy commonality as to his Impermissible Use Class claim.

This Court has held previously that the question of whether a standard waiver form violated §1681b(b)(2) was a common question satisfying Rule 23's "commonality" requirement. See Milbourne v. JRK Residential America, LLC, 2014 WL 5529731, at *5 ("JRK has admitted that it has used a standardized waiver and disclosure form for all class members, including Milbourne. Thus, if Milbourne is able to establish that JRK's waiver did not satisfy §1681b(b)(2)'s requirements this issue will be resolved not only in Milbourne's favor, but in the favor of all class members. Thus, the legality of the forms is of 'such a nature that it is capable of class wide resolution' and satisfied the commonality requirement for the Impermissible Use Class.") (quoting Dukes, 131 S.Ct. at 2251.) This case presents an identical claim under §1681b(b)(2). Thus, the commonality requirement is satisfied.

In addition, this Court has held that "[t]he question of willfulness is also a common question...[when] [t]here is no contention that [Defendant's] state of mind as to individual consumers varied in any way." Id. at *6. Manuel also presents a willfulness question in this case, and Wells Fargo has presented no evidence that its state of mind varied in any way

24

during the class period in question. Thus, the question of willfulness is also a common question in this case.

### b. The Adverse Action Class

Manuel alleges that his adverse action claim satisfies the commonality standard because it presents two common issues of law or fact, namely,: "(a) whether Wells Fargo's form and procedure violated...§1681b(b)(3) because Defendant does not send the required report and disclosures until after it has made and communicated its hiring decision; and (b) whether these violations are willful." Docket No. 60 at 18. Wells Fargo argues that Manuel cannot establish Rule 23 commonality as to the Adverse Action Class. Docket No. 65 at 12.

Wells Fargo argues that Manuel's first common question (whether Well Fargo's procedure violated §1681b(b)(3)) "cannot be resolved by a common answer because it necessitates individualized proof." Id. Specifically, it states that, "[t]o answer the above question, this Court necessarily must establish: (a) when and how Wells Fargo took 'adverse action'; (b) whether each putative plaintiff received a copy of their criminal background screening and a pre-adverse action notice; (c) if so, when each putative plaintiff received a copy of their criminal background screening and a pre-adverse action notice;

25

and (d) at what time Wells Fargo 'made and communicated its hiring decision' as to that applicant." Id. at 13.

Wells Fargo also argues that the question of its willfulness is not a common question because "the truth or falsity of Plaintiffs' central questions cannot be resolved on a class-wide basis [and therefore], Plaintiff's Adverse Action Class cannot be certified." Id. at 14.[5]

The commonality requirement is satisfied if the Court determines that there is one question common to all members of the class such that the question "is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Dukes, 131 S. Ct. at 2551. In Milbourne, this Court found that the question of whether a Defendant's actions violated §1681b(b)(3)(A) satisfied Rule 23(a)'s commonality requirement. It stated that, because the Defendant had "indicated that its practices were standardized during the class period...if [its] actions violated Milbourne's §1681b(b)(3)(A) rights, they also violated other class members' rights as well." Id. at *6.

---

[5] Wells Fargo also makes an argument about statutory damages within the context of commonality, citing Souter for the proposition that "statutory damages 'cannot constitute a point of commonality under Rule 23(a)(2).'" Docket No. 65 at 14. However, as Wells Fargo admits, statutory damages were "not raised by Plaintiffs as a common issue." Id.

As in <u>Milbourne</u>, the question of whether Wells Fargo's actions violated §1681b(b)(3)(a) satisfies the commonality requirement. Wells Fargo has argued that four fact issues necessitate an individualized inquiry and thus destroy commonality. None of these questions need to be resolved by the Court in an individualized manner. However, they are largely resolved by the joint stipulations or by undisputed testimony.

First, pursuant to the Court-amended class definition, all class members will have been "rejected for employment" at Wells Fargo based on their background check within the last two years. Thus, Wells Fargo's first issue will be resolved the same way for all members: they will all have suffered an adverse action between April 1, 2012 and April 1, 2014 and, as part of that adverse action, the class member was rejected for employment at Wells Fargo.

Second, Wells Fargo's contention that Manuel would have to establish "whether each putative plaintiff received a copy of their criminal background screening and a pre-adverse action notice...[and] if so, when each putative plaintiff received a copy of their criminal background screening and a pre-adverse action notice" ignores the facts to which the parties have stipulated. Whether and when class members received the documents mandated by §1681b(b)(3)(A) would be an important fact

27

in determining FCRA liability.  However, Wells Fargo has already stipulated to the fact that the initial notice (titled the "Pre-Adverse Action Notice") was sent automatically after a Wells Fargo employee marked a putative class member as ineligible for employment   Docket No. 43 at ¶1b.   These procedures were "standard policy and procedure" for the class period.  Id. at 1. The record shows that to be true for all of Wells Fargo's business lines.

By the terms of the class definition, all putative class members will have been marked as ineligible for employment by a Wells Fargo employee in the First Advantage system.   Thus, all will have received a §1681b(b)(3)(A) notice pursuant to the procedure outlined above.  Manuel is arguing that the adverse action at issue for each class member is the action that Wells Fargo took when it had an employee code each applicant as "ineligible for employment" in the First Advantage system. Wells Fargo admits that it sent out all §1681b(b)(3)(A) notices after this event took place.  Thus, if the FCRA was violated at all by this practice, it was violated when the code was entered by a Wells Fargo employee, not when an applicant or employee received the FCRA letter.  Because Wells Fargo has stipulated, and the record otherwise shows, that this was a standardized procedure, no individualized analysis is necessary.

Finally, Wells Fargo's contention that Manuel would have to establish "at what time Wells Fargo 'made and communicated its hiring decision' as to [the individual] applicant" is incorrect. As Manuel notes, Wells Fargo takes language from the recitation of facts surrounding his own factual circumstances and makes that language a new requirement for class membership.  There is no reason that Manuel would have to prove, or that the Court would have to determine, when each class member learned of Wells Fargo's decision not to hire him or her.  Further, as the FCRA violation, if any, occurred when the "ineligible for hire" code was entered (as discussed above), the date on which an applicant learned of a hiring decision is of no consequence to this case.

Wells Fargo engaged in a standardized practice whereby it coded an employee "ineligible for hire" and then had its background check service issue a letter that was meant to comply with §1681b(b)(3)(A).  All class members will have been subjected to this practice.  Thus, whether §1681b(b)(3)(A) was violated as to each class member will be answered through one analysis of the practice as issue.  Therefore, the question "is capable of classwide resolution" and commonality is satisfied for the Adverse Action class.

For the reasons discussed previously, the willfulness issue also satisfies the commonality requirement for this class.

29

**4.    Rule 23(a)(3) Typicality**

The Fourth Circuit has described the typicality requirement as follows:

> The typicality requirement goes to the heart of a representative [party's] ability to represent a class, particularly as it tends to merge with the commonality and adequacy-of-representation requirements. The representative party's interest in prosecuting [her] own case must simultaneously tend to advance the interests of the absent class members. For that essential reason, plaintiff's claim cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of [her] own individual claim. That is not to say that typicality requires that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned. But when the variation in claims strikes at the heart of the respective causes of actions, we have readily denied class certification. In the language of the Rule, therefore, the representative party may proceed to represent the class only if the plaintiff establishes that [her] <u>claims or defenses</u> are typical of the <u>claims or defenses</u> of the class.

<u>Deiter v. Microsoft Corp.</u>, 436 F.3d 461, 466-67 (4th Cir. 2006) (emphasis in original) (internal citations and quotation marks omitted).    Thus, the appropriate analysis of typicality "involves[s] a comparison of the plaintiffs' claims or defenses with those of the absent class members."    <u>Id.</u> at 467.    "To conduct that analysis, [the district court] begin[s] with a review of the elements of [the plaintiff's] <u>prima facie</u> case and

30

the facts on which the plaintiff would necessarily rely to prove it." Id.   Then, the district court must determine "the extent to which those facts would also prove the claims of the absent class members." Id.

Wells Fargo first argues that White did not qualify as a member of either class and thus that he could not satisfy the typicality standard as articulated.   Docket No. 65 at 15. Plaintiffs agreed with this statement, and have stated that White is no longer a named plaintiff or a class member.   Docket No. 68 at 9.   His individual action has been severed from the class action.

### a.   The Impermissible Use Class

Wells Fargo does not contend that Manuel is not typical of the Impermissible Use Class.   Manuel argues that his claim is typical of the Impermissible Use Class because his "proof of each of [the] elements [necessary to prove his claim]...will advance the class claims in proportionate degree."   Docket No. 60 at 21.   Further, his "interests are squarely aligned with those of the putative class members", as there are no factual or legal differences between his claim and the class members' claims in general.   Id.

To establish a violation of §1861b(b)(2), Manuel must prove that Wells Fargo did not make an appropriate "clear and

conspicuous disclosure" as mandated by the FCRA prior to conducting its background check.   As there are no controverted facts at issue[6], the resolution of this question will turn on whether the waiver language on the disclosure form violated §1861b(b)(2)'s requirements.   In order to establish that the disclosure form did violate §1861b(b)(2), Manuel will have to establish that legal precedent is such that the form violates the FCRA.

All members of the proposed class make identical claims under §1861b(b)(2).   They all signed identical forms containing the same language that would be at issue in the case.   Because there are no factual differences between claims and the members all raise the same legal issue as Manuel, there are no factual or legal differences between the class members' claims and Manuel's claim.   This indicates that Manuel's "interest in prosecuting his own case [would] simultaneously tend to advance the interests of the absent class members."   Deiter, 436 F.3d at 466.   Thus, typicality is satisfied.

As in the case of commonality, the issue of willfulness would also likely satisfy the typicality requirement.   The facts surrounding Wells Fargo's actions or inactions are identical

---

[6] Wells Fargo has stipulated that it used the same consent form for all putative class members.   The record confirms that fact as to all Wells Fargo business lines.

from class member to class member.  Any individualized actions taken by class members are inconsequential to the analysis, as willfulness turns on Wells Fargo's actions alone.  Thus, because the facts and law that Manuel would be presenting would be identical to the facts and law that all class members would be presenting, the question of willfulness also satisfies the typicality requirement.

### b. The Adverse Action Class

Manuel argues that he satisfies the typicality requirement for the Adverse Action class for the same reasons that he satisfies the requirement for the Impermissible Use Class. Wells Fargo argues that Manuel's claims are not typical of the class and thus that typicality is not satisfied.

Wells Fargo argues that, because Manuel's "motion suggests a theory under which adverse action takes place when Wells Fargo's (preliminary) hiring decision is communicated to the individual in question – not when it is communicated to First Advantage", Manuel's claim is necessarily individualized and therefore not typical of the class members'. Docket No. 65 at 17. It again restates that "resolving the claims underlying Plaintiffs' Adverse Action Class requires this Court to conduct thousands of individualized inquired aimed at resolving whether Wels Fargo took an 'adverse employment action' against each

33

potential class member. Id. at 17-18. "Put differently, the factual inquiries necessary to resolve the named Plaintiffs' claims would not resolve the claims of the proposed Adverse Action Class' claims, as each require evidence of the moment at which they were contacted by Wells Fargo with an adverse hiring decision." Id. at 18.

This argument has been analyzed above. Manuel does not argue that §1681b(b)(3)(A) was violated when he received the FCRA letter, but when a Wells Fargo employee labeled him as "ineligible for hire" in the First Advantage system before a letter was sent out. This was the same procedure used for all applicants during the class period. Thus, no individualized inquiry is necessary. Manuel was subjected to the same procedures as all putative class members and it is those procedures that are challenged.

To establish a violation of §1861b(b)(3)(A), Manuel must prove that Wells Fargo did not provide him with a copy of his consumer report and a description of his rights an adequate time before taking adverse action. The facts necessary to prove Manuel's claims can be gleaned from the files that Wells Fargo kept that contain the details of whether an individual was rejected for employment based in whole or in part on the contents of a criminal background screening. Docket No. 43 at

34

¶4.   Because we know that the procedures by which an individual was rejected were standardized, we know that any employee who was rejected for employment because he or she was ineligible was subjected to the same timeline of procedures.   These procedures establish that a §1681b(b)(3)(A) letter was not sent before the alleged "adverse action" (the entering of the "ineligible" code within First Advantage's system) was completed.   Therefore, in order to prevail, Manuel must establish that this procedure violates §1681b(b)(3)(A) of the FCRA.

All members of the proposed class make identical claims under §1861b(b)(3)(A).   They all were denied employment because their criminal background check rendered them ineligible, and they were all subjected to a procedure which did not sent out §1681b(b)(3)(A) notices until after a Wells Fargo employee indicated that they were ineligible in the First Advantage system.   Because there are no factual differences between claims and the members all raise the same legal issue as Manuel, there are no factual or legal differences between the class members' claims and Manuel's claim.   This indicates that Manuel's "interest in prosecuting his own case [would] simultaneously tend to advance the interests of the absent class members." Deiter, 436 F.3d at 466.   Thus, typicality is satisfied.

For the reasons set forth previously, the issue of Wells Fargo's willfulness would also satisfy the typicality requirement.

### 5.   Rule 23(a)(4) Adequacy of Representation

The adequacy of representation prerequisite requires the Court to be satisfied that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).   This standard is met if "the named plaintiff has interests common with, and not antagonistic to, the [c]lass' interests; and . . . the plaintiff's attorney is qualified, experienced and generally able to conduct the litigation."   In re Se. Hotel Props. Ltd. P'ship Investor Litig., 151 F.R.D. 597, 606-07 (W.D.N.C. 1993).   Because the same counsel and named plaintiff seek to represent both classes, the following analysis applies to both the Adverse Action and Impermissible Use Classes.

Taking the second part of the standard first, the Court should find that Manuel's counsel is qualified, experienced, and able to conduct this litigation.   Counsel is experienced in class action work, as well as consumer protection issues, and has been approved by this Court and others as class counsel in numerous cases.   Wells Fargo's passing argument that counsel is not adequate because they failed to adhere to an agreement

between the parties has been addressed above.   There is no evidence in support of this argument and thus it will not be addressed further.

Manuel argues that he adequately represents the class because he "does not have any interests antagonistic to those of the proposed class and has cooperated with his counsel and pursued this litigation vigorously to redress the wrongs alleged."   Docket No. 60 at 23.   Wells Fargo does not contest Manuel's adequacy as a representative.

All evidence presented so far in the case indicates that Manuel is an adequate representative.   As explained above, his interests and case appear to be identical to putative class members' interests and cases.   Further, counsel has submitted that Manuel has cooperated in the prosecution of this case. Thus, Manuel is an adequate representative for the class members.

**B.   Rule 23(b)(3)**

In order to be certified as a class action, the class must satisfy at least one of the class categories defined in Rule 23(b).   Manuel here moves for certification under Rule 23(b)(3). Certification under Rule 23(b)(3) is appropriate where the Court finds that questions of law or fact common to the members of the class <u>predominate</u> over any questions affecting only individual

37

members, and that a class action is <u>superior</u> to other available methods for the fair and efficient adjudication of the controversy.

**1. Predominance**

"Rule 23(b)(3)'s predominance requirement is 'far more demanding' than Rule 23(a)'s commonality requirement . . . ." <u>Gariety v. Grant Thornton, LLP</u>, 368 F.3d 356, 362 (4th Cir. 2004) (quoting <u>Amchem</u> 521 U.S. at 623–24). "Whereas commonality requires little more than the presence of common questions of law and fact, Rule 23(b)(3) requires that 'questions of law or fact common to the members of the class predominate over any questions affecting only individual members.'" <u>Thorn v. Jefferson-Pilot Life Ins. Co.</u>, 445 F.3d 311, 319 (4th Cir. 2006) (internal citation omitted) (quoting Fed. R. Civ. P. 23(b)(3)). The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." <u>Gariety</u>, 368 F.3d at 362 (internal citation and quotation marks omitted).

**a. Impermissible Use Class**

Manuel argues that the issue of Wells Fargo's liability "represents the central, dominant issue before the Court." Docket No. 60 at 24 (quoting <u>Dreher</u>, 2014 WL 2800766, at *2–3). While he appears to note that individual issues (such as "how to

38

best apportion statutory damages) may exist, he argues that the language of the disclosure form, which is common to all class members renders predominance satisfied. Id. Further, he notes that all class members will share an identical inquiry into Wells Fargo's willfulness and its legal defense, thus providing more common issues that predominate. Id.

Wells Fargo does not assert that Manuel has not established the predominance element for the Impermissible Use Class. Docket No. 65 at 18.

The Fourth Circuit has held that, "where...the qualitatively overarching issue by far is the liability issue of the defendant's willfulness, and the purported class members were exposed to the same risk of harm every time the defendant violated the statute in the identical manner", predominance is satisfied. Stillmock v. Weis Markets, Inc., 385 F. App'x 267, 273 (4th Cir. 2010). See also Dreher v. Experian Info. Solutions, Inc., 2014 U.S. Dist. LEXIS 85951, at *6 (E.D. Va. 2014) ("The question of [Defendant's] liability represents the central, dominant issue before the Court, and while some questions may exist as to how to best apportion statutory damages, those questions do not preclude the common issue of liability from predominating."). Further, "common issues of law and fact predominate if they have a direct impact on every class

39

member's effort to establish liability and on every class
member's entitlement to injunctive and monetary relief."
Stillmock, 385 Fed. App'x at 273 (internal quotation marks
omitted).

As explained above, each class member's case is based on
the same FCRA disclosure form.   Thus, "the purported class
members were exposed to the same risk of harm every time the
defendant violated the statute in the identical manner."  Id.
Thus, the resolution of whether Wells Fargo's FCRA form complied
with §1681b(b)(2) will have "a direct impact on every class
member's effort to establish liability."   Id.  Predominance is
satisfied for the Impermissible Use Class.

### b. Adverse Action Class

Manuel argues that predominance is satisfied for the
Adverse Action Class because, as in the Impermissible Use Class,
Wells Fargo engaged in identical behavior with respect to the
adverse actions taken against all class members.  Docket No. 60
at 24.   Thus, if Wells Fargo is liable, it is liable to all
class members for the same violation.   Additionally, Manuel
notes that willfulness and Wells Fargo's legal defense also
bolster its predominance case.

Wells Fargo argues that Manuel cannot satisfy the
predominance standard for the Adverse Action Class.   Docket No.

40

65 at 18.   In a now familiar refrain, Wells Fargo argues that
"[i]n determining Wells Fargo's liability, a jury would first
have to examine the timing, existence, and rationale for any
'adverse employment action.'"   Id. at 19.   Further, it argues
that "before Plaintiffs could recover a single cent of statutory
damages, a jury would have to examine the totality of the
circumstances involved in each consumer's interaction with Wells
Fargo in connection to tis willfulness inquiry."   Id.   Finally,
it argues that, even if willfulness was established, a jury
would have to conduct an individualized inquiry into each class
member to determine statutory damages.   Id.

     Wells Fargo is arguing that each class member will have to
establish that he or she suffered an adverse action and that he
or she did not receive the mandated FCRA disclosures before the
adverse action was taken.   It also argues that each class member
will have to establish when Wells Fargo "made and communicated
its hiring decision" to the applicant.   This analysis
fundamentally misunderstands Manuel's case.   Manuel is not
arguing that Wells Fargo acted in individualized ways that
potentially violated the FCRA rights of applicants differently.
Rather, Manuel is arguing that Wells Fargo always entered the
"ineligible for employment" code before sending the adverse
action notice.   He is arguing that entering that code was the

41

adverse action because it was a final decision of a refusal to hire. Because Wells Fargo has admitted that it did not send letters before that code was entered (the entering of the code triggered the letter), all class members' letters would necessarily have been sent _after_ what Manuel argues is the adverse action.

No individualized inquiry is necessary to determine whether a class member suffered an adverse action. As discussed above, the class definition has been changed to replace the term "adverse action" with "rejected for employment." Thus, all class members share the same adverse action. Further, no individualized inquiry is necessary to determine when a class member received the FCRA disclosures, because Wells Fargo has conceded that all of them received their disclosures after the "ineligible for hire" code was entered. Further, as Wells Fargo has admitted that it had standardized procedures during the class time period and Manuel is challenging only those standardized procedures, the issue of willfulness would deal only with Wells Fargo's approach to those procedures and their compliance with the FCRA. No individualized proof would be necessary to determine the issue of willfulness.

Finally, Wells Fargo's argument that individualized statutory damages preclude a finding of predominance ignored

42

precedent which established that "the question of statutory damages may be individualized but is minimally influential in the predominance analysis." <u>Soutter v. Equifax Information Services, LLC</u>, 2015 WL 1787236 (E.D. Va. 2015), at *25. While it argues that this holding was "underpinned by the notion that...the common issue of liability predominates over the question of how to best apportion statutory damages" and that this underpinning does not exist here, the above analyses renders that argument inconsequential. Docket No. 65 at 21 (internal quotation omitted).

As explained above, each class member's case is based on his or her rejection for employment at Wells Fargo. Further, the parties have stipulated that all FCRA letters were sent out after this "adverse action" was taken. Thus, "the purported class members were exposed to the same risk of harm every time the defendant violated the statute in the identical manner." <u>Id.</u> <u>Stillmock</u>, 385 Fed. App'x at 273. "The question of [Defendant's] liability represents the central, dominant issue before the Court, and while some questions may exist as to how to best apportion statutory damages, those questions do not preclude the common issue of liability from predominating." <u>Dreher</u> at *6. Predominance is satisfied.

## 2.    Superiority

Superiority requires that use of a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Superiority "'depends greatly on the circumstances surrounding each case,'" and "'[t]he rule requires the court to find that the objectives of the class-action procedure really will be achieved.'" Stillmock, 385 F. App'x at 274 (quoting 7A Wright, Miller & Kane, supra, § 1779). When making a "determination of whether the class action device is superior to other methods available to the court for a fair and efficient adjudication of the controversy...[the court should] not contemplate the possibility that no action at all might be superior to a class action." Brown v. Cameron-Brown Co., 92 F.R.D. 32, 49 (E.D. Va. 1981). Factors the court should consider include, but are not limited to, "the class members' interest in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation concerning the controversy already begun by or against class members; the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the likely difficulties in managing the class action." Fed. R. Civ. P. 23(b)(3)(A)-(D).

Manuel argues that a class action is superior in this case to other methods available for adjudication. Docket No. 60 at 25. He argues that it would waste judicial and individual resources to have hundreds of trials, that individual plaintiffs are not likely to understand the FCRA and that they might have a case under it, that individual plaintiffs are unlikely to bring a lawsuit under the FCRA because of the marginal statutory damages, and that litigation under the class action framework is effectively the only way that private individuals can enforce the FCRA. Id. at 25-28. Wells Fargo does not argue that superiority is not satisfied.

The potential class members' claims for statutory damages are small when considered in comparison to the effort it would take to assert them in court. The FCRA allows statutory damages up to $1,000 and, in the case of a willful violation, punitive damages which are limited by the due process clause of the Constitution. A successful plaintiff can also receive attorney's fees and court costs. In comparison, initiating an action in federal court requires the plaintiff's time and effort, an attorney's willingness to take the case, and the plaintiff's acceptance of the possibility that he could be forced to pay attorneys' fees if he does not prevail. Additionally, as Manuel pointed out, many plaintiffs will not be

aware that their rights were violated because of the technical nature of the FCRA and thus would not be able to bring a suit at all.

In addition to ensuring a full and fair adjudication of all members' cases, the class action is a superior method in this instance for several practical reasons. First, it preserves judicial economy. It saves time and resources to settle the issues presented on a class-wide basis rather than to conduct several hundred individual trials on the same issues. Second, the factors listed in Rule 23 weigh in favor of a class action's superiority. First, there seems to be little interest in controlling individual cases, as individual class members are likely to receive the same award in class litigation as they would in individual litigation, if they even pursued it. Second, there is no other related litigation pending that bears on this analysis. Third, because potential class members are spread over the entirety of the United States, it would be very desirable to hear the case in one forum and thus allow for a more efficient, consolidated resolution. Finally, the similarity of factual and legal issues indicates that a class action would be manageable from the parties' and court's perspective. Thus, the class action appears to be the superior method of pursuing this FCRA claim in this case.

## CONCLUSION

For the reasons set forth above, the Plaintiff's MOTION FOR CLASS CERTIFICATION (Docket No. 59) will be granted in part and denied in part. Specifically, the Impermissible Use Class will be certified according to Manuel's proposed class definition. The Adverse Action Class will be defined as follows:

> All natural persons residing in the United States (including all territories and other political subdivisions of the United States), who applied for an employment position with Defendant or any of its subsidiaries within the two years immediately preceding the filing of the Complaint in this matter on April 1, 2014, and as part of this application process were the subject of a consumer report obtained by Defendant, (a) who Defendant rejected for employment; (b) and to whom Defendant did not provide a copy of the consumer report as stated at 15 U.S.C. §1681b(b)(3)(A) at least five business days before the date the consumer report at First Advantage was first coded as ineligible for hire.

It is so ORDERED.

_____ /s/    _REP_____

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: August _19__, 2014

47